1  **JOHNSON FISTEL, LLP**
   Frank J. Johnson (SBN 174882)
2  FrankJ@johnsonfistel.com
   Brett M. Middleton (SBN 199427)
3  BrettM@johnsonfistel.com
   655 West Broadway, Suite 1400
4  San Diego, CA 92101
   Telephone: (619) 230-0063
5  Facsimile: (619) 255-1856

6  *Counsel for Plaintiff*

7

8  **UNITED STATES DISTRICT COURT**

9  **NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DANIEL GUIRGUIS, on behalf of himself and a class of similarly situated investors, | Case No.: 4:21-cv-00164 |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| v. | **CLASS ACTION** |
| SPLUNK INC., DOUGLAS S. MERRITT, and JASON E. CHILD | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Daniel Guirguis ("Plaintiff"), individually and on behalf of all others similarly situated, by and through Plaintiff's counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (i) regulatory filings made by Splunk Inc. ("Splunk" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases and media reports issued by and disseminated by the Company; and (iii) analyst reports, media reports, and other publicly disclosed reports and information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a securities fraud class action on behalf of all purchasers of Splunk common stock between August 26, 2020 and December 2, 2020, inclusive (the "Class Period"), who were damaged thereby (the "Class"). The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"). These claims are asserted against Splunk and certain of its officers who made materially false and misleading statements during the Class Period in press releases and filings with the SEC.

2. Based in San Francisco, California, Splunk develops and markets software solutions that enable organizations to gather, organize, and analyze their enterprise data.

3. Throughout the Class Period, defendants violated the federal securities laws by disseminating false and misleading statements to the investing public and/or failing to disclose adverse facts pertaining to the Company's business, operations, and prospects. Specifically, defendants concealed material information and/or failed to disclose that:

    (a) Splunk was facing pushback from clients across its largest and most important accounts as it attempted to implement a new pricing model and secure customer renewals;

    (b) Splunk had failed to close several deals with its largest customers;

    (c) Splunk had fallen far behind previously announced financial targets; and

(d) consequently, defendants lacked a reasonable factual basis to make the statements they made regarding Splunk's results and operational performance.

4. On December 2, 2020, after the market closed, Splunk was forced to disclose a severe revenue shortfall and disappointing financial results. While defendants attributed the shortfall to "uncertainty and volatility for macro factors" that "cause[d] customers to delay spending commitments, particularly for high-value contracts," Wall Street analysts challenged defendants' explanation in light of significantly better performance by Splunk's competitors. For example, analysts at BTIG pointed out that Splunk's explanation "is fairly confusing given that most peers in the software space (and particularly in security software) saw relatively strong trends." J.P. Morgan analysts were similarly "blindsided by the magnitude of too many large deals slipping in the final days of October."

5. On this news, the price of Splunk common stock declined more than 23%.

6. As a result of defendants' wrongful acts and omissions, plaintiff and the Class (as defined below) purchased Splunk common stock at artificially inflated prices and were damaged thereby.

## JURISDICTION AND VENUE

7. The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC.

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 27 of the 1934 Act.

9. Venue is proper in this District pursuant to § 27 of the 1934 Act and 28 U.S.C. § 1391(b). Defendant Splunk is located in this District and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

10. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

11. Plaintiff Daniel Guirguis, as set forth in the accompanying certification, purchased Splunk common stock during the Class Period and was damaged thereby.

12. Defendant Splunk, incorporated in Delaware, maintains its principal executive offices at 270 Brannan Street, San Francisco, California 94017. Splunk common stock trades on the NASDAQ under the ticker symbol "SPLK."

13. Defendant Douglas S. Merritt ("Merritt") is, and at all relevant times was, President, Chief Executive Officer ("CEO") and a director of Splunk.

14. Defendant Jason E. Child is, and at all relevant times was, Chief Financial Officer ("CFO") and Senior Vice President of Splunk.

15. The defendants referenced above in ¶¶ 13–14 are referred to herein as the "Individual Defendants." The Individual Defendants made, or caused to be made, false statements that artificially inflated the price of Splunk stock during the Class Period. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Splunk's quarterly reports, press releases, and presentations to analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

16. Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Splunk. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Splunk stock was a success, as it: (i) deceived the investing public regarding Splunk's business and prospects; (ii) artificially inflated the price of Splunk stock; (iii) permitted defendants Merritt and Child to sell 58,550 shares of their Splunk stock for proceeds of more than $11.3 million; and (iv) caused plaintiff and other members of the Class to purchase Splunk stock at artificially inflated prices.

## DEFENDANTS' SCIENTER

17. During the Class Period, defendants had the motive and opportunity to commit securities fraud. During the Class Period, defendant Merritt sold nearly $9.2 million worth of his personal Splunk shares at prices as high as $219.74 per share. Similarly, during the Class Period, defendant Child sold nearly $2.2 million worth of his personal Splunk shares at prices as high as $210.00 per share. These sales were suspicious in both timing and amount. Defendants also had actual knowledge of the misleading statements they made and/or acted in reckless disregard of the truth at the time. In doing so, defendants participated in a scheme to defraud and committed acts and practices and participated in a course of business that operated as a fraud or deceit on purchasers of Splunk stock during the Class Period.

## FACTUAL BACKGROUND

18. Splunk develops and markets software solutions that enable organizations to gain real-time operational intelligence in the United States and internationally. According to the Company's most recent Form 10-K filed with the SEC, the Company "provides innovative software solutions that ingest data from different sources including systems, devices and interactions, and turn that data into meaningful business insights across the organization." Splunk states that its "Data-to-Everything platform enables users to investigate, monitor, analyze and act on data regardless of format or source."

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

19.     The Class Period begins on August 26, 2020, when Splunk issued a press release announcing its results for the second fiscal quarter of 2021 (ending July 31, 2020). The press release also provided guidance for the third fiscal quarter of 2021 (ending October 31, 2020), stating that "[t]otal revenues are expected to be between $600 million and $630 million," and that "[n]on-GAAP operating margin is expected to be between 2% and 5%." The press release further stated in part:

> "Splunk's cloud business continues to accelerate, now representing more than half of our software bookings in the quarter – a major milestone in our cloud journey," Merritt continued. "I'm very proud of our team, strong execution and continued momentum as we look forward to revealing our line-up of trendsetting product innovations at .conf20."

> "Splunk's rapid transformation to the cloud has enabled us to reach key milestones ahead of schedule. Cloud ARR growth accelerated to 89%, or $568 Million, far exceeding our expectations. We also now have nearly 400 customers with ARR in excess of $1 million as more and more businesses embrace our cloud platform," said Jason Child, chief financial officer, Splunk. "Our customers want the flexibility to transition to cloud, and with our diligent planning, we've continued to advance our mission to remove the barriers between data and action."

20.     Also on August 26, 2020, Splunk held an earnings conference call to discuss the quarterly results hosted by defendants Merritt and Child. During his prepared remarks, defendant Merritt stated: "Many of the purchasing trends we saw in Q1 continued or accelerated in Q2." Defendant Child similarly stated in part:

> Turning to guidance. It's important to highlight that the fundamentals of the business remains strong, and we're confident in our ability to deliver continued high growth over the long term. Given current visibility, we are maintaining our total ARR growth targets of mid-40% this year and a 3-year CAGR of 40% through FY '23.

21.     On September 24, 2020, Splunk announced that Susan St. Ledger, the Company's former President, Worldwide Field Operations (*i.e.*, the head of sales), would be leaving Splunk to work at another technology company. No additional information was provided regarding the reasons for Ms. St Ledger's departure.

22. On October 21, 2020, just ten days before the close of Splunk's third fiscal quarter of 2021, defendants assured investors during an investor conference call that everything was on track for the close of the quarter and reaffirmed Splunk's quarterly guidance. During the conference call, defendant Merritt represented in part:

> [B]y the end of this year, we'll have reached our fiscal '23 goal, nearly 2 years early. And our customers are increasingly committing to bigger deals, as you can see in the tally of customers with ARR over $1 million.
>
> *   *   *
>
> Given the importance of ARR and using that as a prime comparison, Splunk is growing faster, actually much faster than the household name cloud software players when they're at our stage. At the end of Q2 with our ARR, just short of $2 billion, Splunk grew at 50% year-over-year. And as I said earlier, that was our seventh quarter of at least 50% growth. That means this block is growing faster than ServiceNow at $2 billion, faster than Salesforce at $2 billion and faster than Workday at $2 billion.

23. Additionally during the conference call, defendant Child stated, in part:

> Our transformation has made our financials complicated, and I'm excited to bring some clarity to you today and make the most recent progress on our financials clearer. And most importantly, to make clear why we are so excited about both our near-term and long-term future growth prospects and our ability to generate meaningful cash flow from operations.
>
> *   *   *
>
> Moving on to ARR. I first want to take a moment to dig a little deeper into our ARR numbers published up until this point and shine a light on some of the components of ARR. We dug into the numbers to determine 2 things that I think might be helpful for you.
>
> First, we quantified the tailwind to ARR attributable to our shift away from perpetual and renewable software. Perpetual contracts, which fell to only 1% of software bookings by the end of FY '20, only generated ARR from their maintenance streams, whereas term and cloud contract value is fully counted in ARR.
>
> As we've been asked many times, how much of an impact the shift away from perpetual has had on our ARR numbers, we decided to quantify this for you today. No more mystery, it's all laid out here for you.
>
> Second, we quantified the tailwind impact from the acquisition of SignalFx. This one shouldn't be a surprise. We told you in Q3 of last year that SignalFx had a 300 basis point tailwind to total ARR. However, any benefit received from SignalFx completely disappears beginning this quarter as we lapped the date of the acquisition.
>
> And here's the critical takeaway. By the end of Q4, we estimate that the tailwind from the shift from perpetual falls to less than 1%. So looking forward, we are

reiterating our 40% compounded annual growth rate target for ARR from FY '20 through '23. It should be clear now why we remained confident in these targets given growth tailwinds that I described earlier.

24. Defendant Child also discussed as the first of the "4 biggest drivers of growth" for the Company "the significant and growing customer renewal base." He continued: "So yes, we're still sticking to the $1 billion cash flow target for '23. My hope is that the slide would kind of provide a little more context and hopefully help you understand why we feel good about that. . . . So yes, we're definitely sticking to that target."

25. Defendant Child highlighted Splunk's biggest and most important accounts, claiming that, "[f]or our larger customers, we're adding particular value across the expanded data volumes and infrastructures," and that Splunk had "been successful with growing those relationships and offering new areas of value over time." Defendant Child further stated, in part:

> Let's now move on to the cloud and why our shift to being cloud-first reinforces our confidence in hitting our growth targets. First, we want to level set for you what our renewal base looks like over the next couple of years. As we shifted away from selling perpetual software licenses and ramped up our renewable mix to reach 99% of all software bookings by Q4 of last year, we've created an accelerated renewal base that you can see ramps up sharply over the next 3 years.
>
> Through the end of FY '20, our term and cloud contracts had an average duration of approximately 3 years. So as we anniversary the contract renewal date for this renewable software base, you can see how much contract value on an ARR basis is up for renewal in any given year. This is what fuels our confidence in our long-term growth. Every one of these contracts up for renewal is an opportunity for us to grow.

26. The statements referenced above were materially false and misleading because they misrepresented and/or failed to disclose the following adverse facts that were known to defendants or recklessly disregarded by them:

    (a) That Splunk was facing pushback from clients across its largest and most important accounts as it attempted to implement a new pricing model and secure customer renewals;

    (b) That Splunk had failed to close several deals with its largest customers;

    (c) That Splunk had fallen far behind previously announced financial targets; and

        (d)    That, consequently, defendants lacked a reasonable factual basis to make the statements they had made during the Class Period regarding Splunk's financial and operational results and third quarter guidance.

27. On December 2, 2020, after the market closed, Splunk announced its financial results for its third fiscal quarter of 2021, ended October 31, 2020. The results came in far below guidance, despite the fact defendants had recently reaffirmed that guidance with just days left in the quarter. For example, Splunk achieved only $559 million in quarterly revenues, down 11% year over year and 9% below the mid-point of previous projections. That same day, the Company also held an earnings call during which defendant Merritt blamed the terrible results on a "much lower-than-normal close rate among our largest deals, which caused us to fall short of our bookings target." Defendant Child echoed that comment, stating that "close rates for several large transactions slowed significantly in the final weeks of the quarter, resulting in total bookings coming in below plan."

28. The sudden and inexplicable failure to close deals with several of Splunk's largest and most important customers across its business surprised the market. Analysts at BTIG wrote that defendants' explanation "is fairly confusing given that most peers in the software space (and particularly in security software) saw relatively strong trends." Analysts at J.P. Morgan echoed this sentiment, writing that they were "blindsided by the magnitude of too many large deals slipping in the final days of October on the heels of an upbeat analyst day 10 days prior to the quarter close, at which the company reaffirmed guidance and stated that it was excited about near term and long term growth prospects." J.P. Morgan and numerous other analysts immediately downgraded their ratings for Splunk stock and slashed their target prices.

29. In response to these disclosures, the price for Splunk stock declined more than 23%, the largest single-day decline in the Company's history, damaging Splunk's shareholders.

30. As a result of defendants' wrongful acts and omissions, plaintiff and the Class purchased Splunk common stock at artificially inflated prices and were damaged thereby.

**LOSS CAUSATION AND ECONOMIC LOSS**

31.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Splunk stock and operated as a fraud or deceit on purchasers of Splunk stock. As detailed above, when the truth about Splunk's misconduct was revealed, the value of the Company's stock declined precipitously as the prior artificial inflation no longer propped up the stock's price. The decline in Splunk's stock price was the direct result of the nature and extent of defendants' fraud being revealed to investors and the market. The timing and magnitude of the share price decline negate any inference that the losses suffered by plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of the Company's stock and the subsequent significant decline in the value of the Company's stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

32.     At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Splunk's business and operations as alleged herein.

33.     Throughout the Class Period, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the price of Splunk stock to be artificially inflated. Plaintiff and other Class members purchased Splunk stock at artificially inflated prices, causing them to suffer damages as complained of herein.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**

34.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

  (a) defendants made public misrepresentations or failed to disclose material facts during the Class Period;

  (b) the omissions and misrepresentations were material;

  (c) the Company's stock traded in an efficient market;

  (d) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

  (e) plaintiff and other members of the Class purchased Splunk stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

35. At all relevant times, the market for Splunk stock was efficient for the following reasons, among others:

  (a) Splunk stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient market;

  (b) as a regulated issuer, Splunk filed periodic public reports with the SEC; and

  (c) Splunk regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## NO SAFE HARBOR

36. Defendants' false or misleading statements during the Class Period were not forward-looking statements ("FLS"), or were not identified as such by defendants, and thus did not fall within any "Safe Harbor."

37. Splunk's verbal "Safe Harbor" warnings accompanying its oral FLS issued during the Class Period were ineffective to shield those statements from liability.

38. Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS

was authorized and/or approved by an executive officer of Splunk who knew that the FLS was false. Further, none of the historic or present-tense statements made by defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## CLASS ACTION ALLEGATIONS

39. Plaintiff brings this action on behalf of all purchasers of Splunk common stock during the Class Period who were damaged thereby (the "Class"). Excluded from the Class are defendants and their immediate families, the officers and directors of the Company and their immediate families, the legal representatives, heirs, successors, or assigns of any of the foregoing, and any entity in which any of the defendants have or had a controlling interest.

40. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Splunk shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class located geographically throughout the country. Joinder would be highly impracticable. Record owners and other members of the Class may be identified from records maintained by Splunk or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the federal laws complained of herein.

42. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

43. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

(c) whether the price of Splunk stock during the Class Period was artificially inflated because of defendants' conduct complained of herein; and

(d) whether the members of the Class have sustained damages and, if so, the proper measure of damages.

44. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of § 10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

45. Plaintiff incorporates ¶¶ 1–44 by reference.

46. During the Class Period, defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

47. Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Splunk stock during the Class Period.

48. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Splunk stock. Plaintiff and the Class would not have purchased Splunk stock at the prices they paid, or at all, had they been aware that the market prices were artificially and falsely inflated by defendants' misleading statements.

49. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Splunk stock during the Class Period.

## COUNT II

**For Violation of § 20(a) of the 1934 Act**
**Against All Defendants**

50. Plaintiff incorporates ¶¶ 1–49 by reference.

51. During the Class Period, defendants acted as controlling persons of Splunk within the meaning of § 20(a) of the 1934 Act. By virtue of their positions and their power to control public statements about Splunk, the Individual Defendants had the power and ability to control the actions of Splunk and its employees. Splunk controlled the Individual Defendants and its other officers and employees. By reason of such conduct, defendants are liable pursuant to § 20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

1       B.      Awarding plaintiff and the members of the Class damages and interest;

2       C.      Awarding plaintiff's reasonable costs, including attorneys' fees; and

3       D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: January 8, 2021            **JOHNSON FISTEL, LLP**

                            By: */s/ Brett M. Middleton*
                                BRETT M. MIDDLETON

FRANK J. JOHNSON
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
BrettM@johnsonfistel.com
FrankJ@johnsonfistel.com